

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-433-CR

RANDY WILSON                                                      APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Randy Wilson appeals his conviction for murder.  In four points, Wilson argues that the evidence is legally and factually insufficient to sustain his conviction; that the trial court abused its discretion by allowing the State to introduce photographs of the deceased's body; and that the trial court abused

---

[1] *... See* Tex. R. App. P. 47.4.

its discretion by allowing a witness to testify that the victim had worked as a prostitute for Wilson prior to her murder. We will affirm.

## II. BACKGROUND

In the early morning, August 19, 2007, two fishermen saw what they believed to be a floating deer carcass in Lake Arlington. What they found was Brittany Rapoza's partially nude, heavily decomposed body. The fishermen called 9-1-1, and the Arlington Police Department investigated.

After the fishermen called 9-1-1, Officer Leonor Cerda arrived, and the fishermen escorted him to the body. Cerda said that due to the bloated and decomposed condition of the body, which was laying face down in the lake, it was initially difficult to determine whether the body was male or female. After retrieving the body from the lake, officers were able to determine that the body was female.

Detective Jim Ford also arrived at the lake that day. Ford testified that the body had no identifying marks and that no forms of identification were found on the body. Ford again observed the body once it had been delivered to the medical examiner. The body had multiple stab wounds. Initially, Ford researched missing persons databases but was unable make an identification. Ford then issued a press release soliciting information. According to Ford, a witness—Jenny Yeager—came forward on October 8, 2007, with information

2

regarding the body. Yeager identified the body as being that of Brittany Rapoza. The next day, Yeager escorted Ford to a location near where Rapoza's body was found. There, in a storm drain, Ford collected a portion of a burned shoe. Ford contacted the Tarrant County Medical Examiner's Office and requested that they conduct DNA testing on the shoe.

Yeager also accompanied Ford to McCray Park—a park located on Lake Arlington near where Rapoza's body was found. There, along a path and near an embankment, Yeager pointed out "an orang[]ish-colored bathing suit strap." In addition to information pertaining to Rapoza's murder, Yeager also provided Ford with additional names of witnesses—Cyndi Garcia, Laura Mallard, Delicia Traylor, and Joseph Grant. Yeager even personally escorted Ford to Grant's residence.

Based on information from Yeager, Garcia, and Mallard, Ford obtained arrest warrants for Wilson and Grant. Because Grant cooperated, Ford did not arrest Grant; rather, Ford interviewed Grant twice. Grant provided further information about Rapoza's murder.

At trial, Grant identified Wilson as the man he knew by the nickname, "C." Grant met Wilson at the house of Grant's sister, along with Garcia, Yeager, and Rapoza in August 2007. Grant said that he, Wilson, Rapoza, Yeager, and Garcia drove to Lake Arlington in the late evening of August 13,

3

2007. When they arrived, Wilson and Rapoza got out of the car and walked away by themselves. Roughly fifteen minutes later, Grant went to find them. When he found them, Grant saw Wilson and Rapoza fighting. Grant testified that he was going to break up the fight when he noticed that Wilson had a knife in his hand. Grant said that he witnessed Wilson repeatedly stab Rapoza with the knife. According to Grant, Wilson then kicked Rapoza in the stomach and kicked her over a small ledge and into the lake. Grant said that he attempted to "get her out [of] the lake" and tried to push her up a ledge. Rapoza was trying to climb up the ledge when Grant either let her go or dropped her because Wilson was walking toward him. Grant became scared and ran back to the car. Wilson eventually returned to the car covered in blood, and the remaining four returned to the house of Grant's sister. Grant testified that nothing was said among the four about what had happened to Rapoza.

A couple of days later, Grant said that he, Wilson, Yeager, Garcia, and his sister returned to Lake Arlington. The five walked to the crime scene, which was now surrounded by yellow crime scene tape, and Wilson "started kicking some dirt around pointing [out] where [Rapoza's] blood was by [a] tree." Grant said he also saw Wilson throw a "flip-flop" into the lake. Grant said that after he went back to the parking lot, Wilson returned with a beer can and a bloody cigarette butt.

4

Yeager testified that she met Wilson while living in an abandoned home in the spring of 2007. Yeager referred to Wilson as her "boyfriend." According to Yeager, she and Wilson moved in together shortly after meeting, living with another of Wilson's girlfriends and her children.

Yeager said that she and Wilson first met Rapoza in April or May 2007. Yeager and Wilson had seen Rapoza walking with "seven to ten guys" along a street where many homeless people tend to congregate. Wilson asked Rapoza "if she needed a job, if she wanted to work for him." Yeager said that Wilson became Rapoza's "pimp" and that Rapoza "would be the prostitute and he would provide her with protection . . . food and shelter and she would go out and make the money." Wilson and the three women lived together. By Yeager's account, Wilson did not allow Rapoza to keep any of the money she earned prostituting; rather, he would buy Rapoza alcohol, and "if she was lucky," he would buy her cigarettes.

Yeager said that Wilson became displeased and violent with Rapoza because he thought she "wasn't making enough money." According to Yeager, "[W]hen [Rapoza] wouldn't feel like going out, or when she didn't bring the right amount of money back, you know, she would - - if - - it started out, you know, pushing and slapping and shoving and strangling, and moved on to . . . pretty brutal beatings."

5

Yeager testified that on the day Rapoza was killed, Rapoza called Wilson. After the call, Wilson left in the early evening to meet her. Wilson returned after Yeager had gone to sleep; but when she woke up, Yeager said that Wilson had "blood all over his shoes [and] blood [spattered] all over his glasses." Yeager described Wilson's shoes as being "completely blood soaked, completely." She said he also had blood on his clothing. Yeager said that Wilson admitted to killing Rapoza:

> [H]e said he took her down to the lake, and he told her that - - that she was going to get to [perform oral sex]. And so, when she started to take off her top, he told me that he stabbed her in the heart, and that he stabbed her in the face and that he stabbed her in the breasts, and he stabbed her in the butt, he stabbed her in her vagina. That's what he told me.

The day after the murder, Yeager accompanied Wilson to the scene of the crime to retrieve Wilson's cell phone, which he had left there. Yeager said that Wilson also picked up Rapoza's sunglasses, a beer can, and some cigarette butts. The couple returned to the lake four to five days later along with Garcia and Grant. Yeager said that the purpose of their return to the lake was to "see if there was any possible evidence left." Similar to Grant's account, Yeager testified that they found one of Rapoza's shoes but said that it was Grant, not Wilson, who picked it up and threw it into the lake. Yeager also witnessed Wilson attempt to destroy his own bloody shoes. According to Yeager, Wilson

6

poured gasoline on the shoes and set them on fire and then "kicked them down into the drainage ditch"—the same ditch where Ford collected a portion of a burned shoe. Consistent with Ford's testimony, Yeager said that she went to the police on October 8, 2007, and told them what she knew of Rapoza's murder. She also said that she took officers to the crime scene and to the location where she watched Wilson burn his shoes.

Delicia Traylor, an acquaintance of Yeager, testified that Wilson told her that he had "killed [a young girl] over a respect thing . . . because that's how much he loved [Yeager], and [that] it was at [Lake Arlington]." On cross-examination, Traylor said that she did not remember the specifics of her conversation with Wilson. On redirect examination, Traylor clarified that she told Ford that Wilson told her that he had dumped a body in Lake Arlington.

Carolyn Van Winkle, a DNA analyst for the Tarrant County Medical Examiner's Office, testified that she analyzed over thirty samples that Ford had submitted for testing in October 2007. Van Winkle tested a pair of eyeglasses, a bikini strap, some seat covers from the car driven to the lake by the party that included Wilson and Rapoza, and carpet from the floorboard of the same vehicle. Van Winkle did not recover any DNA or blood evidence from these items. But Van Winkle did find blood present on a burned shoe that was found in the drain where Yeager had taken Ford. Van Winkle also recovered a partial

7

DNA profile (four of fifteen markers) from the shoe. Van Winkle compared the DNA recovered from the shoe with DNA taken from Rapoza's body—the two samples were a statistical match.

Dr. Gary Sisler, a deputy medical examiner, performed the autopsy on Rapoza's body. Sisler testified that he "found multiple stab wounds on the body" that were likely caused by a knife or bladed instrument. He said that the stab wounds were the cause of death given that approximately eleven of the stab wounds would have caused excessive blood loss and would have been fatal. Sisler ruled Rapoza's death a homicide. But due to the advanced decomposition, Sisler was unable to determine a time of death.

The State indicted Wilson for murder. The indictment included a repeat offender notice. Wilson pleaded not guilty to the charge of murder and true to the enhancement paragraph. A jury found Wilson guilty and assessed punishment at life imprisonment. This appeal followed.

### III. Sufficiency of the Evidence

In his first and second points, Wilson argues that the evidence is legally and factually insufficient to convict him of murder. Specifically, Wilson contends that the State failed to prove beyond a reasonable doubt that he committed the offense as set out in the indictment. We disagree.

A.    Law on Murder

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2) (Vernon 2003).  In its indictment, the State charged that Wilson did "intentionally or knowingly cause the death of an individual, [Rapoza], by stabbing her with a knife or a bladed instrument." Alternatively, the State charged that Wilson did "intentionally, with the intent to cause serious bodily injury to [Rapoza], commit an act clearly dangerous to human life, namely, stab [Rapoza] with a knife or a bladed instrument, which caused" her death.

B.    Legal Sufficiency Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw

9

reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.  The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000).  Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."  *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution.  *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

C.      Factual Sufficiency Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App.

10

2006).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust.  *Lancon v. State*, 253 S.W.3d 699, 704–05 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417.  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.  *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction."  *Id*.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence.  *Id*.  We may not simply substitute our judgment for the factfinder's.  *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence

11

because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon,* 253 S.W.3d at 704. An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

D.    Legally and Factually Sufficient Evidence

Viewing the evidence in the light most favorable to the verdict, the record demonstrates that there was legally sufficient evidence that Wilson murdered Rapoza. In this case, there was an eyewitness who testified that Wilson stabbed Rapoza multiple times and kicked her body into the lake. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (stating that a conviction may be supported by testimony of only one eyewitness). Wilson's girlfriend testified that he was wearing blood-soaked shoes, bloody clothing, and glasses with blood spattered on them the morning after Rapoza was killed. The girlfriend also testified that Wilson described having stabbed Rapoza multiple

12

times. She also took police to a location where a burned shoe was found that had DNA consistent with Rapoza's DNA on it. The girlfriend explained how Wilson had poured gasoline on his blood-covered shoes and had set them on fire at the location where the shoe was found. *See Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd) ("It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged."). Another witness testified that Wilson had admitted to killing a young lady at Lake Arlington. And multiple witnesses testified that they had accompanied Wilson back to Lake Arlington after Rapoza was murdered and that Wilson had attempted to further conceal evidence of the crime. *See id.* The medical examiner testified that Rapoza had been stabbed multiple times and that a number of the stab wounds would have been fatal.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found that the evidence at trial was sufficient to establish the elements of murder, as spelled out in the indictment, beyond a reasonable doubt. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778; *see also* Tex. Penal Code Ann. § 19.02(b)(1)–(2) (providing elements of murder). Accordingly, we hold that the evidence is

13

legally sufficient to support Wilson's conviction. We overrule Wilson's first point.

Furthermore, we have reviewed the evidence in a neutral light, and we find no objective basis in the record for holding that the jury's verdict was clearly wrong or manifestly unjust or that it was contradicted by the great weight and preponderance of the evidence. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Rather, the evidence presented at trial was sufficient to support the verdict and included the testimony of an eyewitness that Wilson had stabbed Rapoza; a witness who saw Wilson in bloody clothing the day after Rapoza's murder; witnesses who testified that Wilson had returned to conceal and destroy evidence; and witnesses who testified that Wilson had admitted to killing Rapoza at the location where her body was found. Additionally, no contrary evidence exists—and Wilson points to none in the record—that would render the evidence factually insufficient under the applicable standard of review. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Accordingly, we hold that the evidence is factually sufficient to support Wilson's conviction. We overrule Wilson's second point.

14

## IV. OBJECTED-TO PHOTOGRAPHS

In his third point, Wilson argues that the trial court abused its discretion by overruling his objection to the admission of photographs that the State introduced depicting the condition of Rapoza's body as it was found in Lake Arlington. Specifically, Wilson argues that the "photographs of the deceased did no more than to inflame the jury in sympathy for the State."

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403.

Once a rule 403 objection is made, the trial court must weigh the probative value of the evidence to determine if it is substantially outweighed by its potential for unfair prejudice. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). A rule 403 balancing test includes the following factors: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that

15

presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 & n.8 (Tex. Crim. App. 2006).

The rules of evidence favor the admission of relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997). When determining whether evidence is admissible under rule 403, we do not consider just whether the evidence is more prejudicial than probative, we consider whether the probative value is substantially outweighed by the danger of unfair prejudice. *Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006), *cert. denied*, 549 U.S. 1224 (2007). Our highest criminal court has observed that we will reverse the trial court's judgment under rule 403 "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). And this is as it should be—it is the trial judge, in the midst of the trial itself, who is in the best position to weigh the probative versus prejudicial value of evidence on Themis's scales of justice. *See id.* As long as the trial court's ruling is within the zone of reasonable disagreement and is correct under any theory of law applicable to the case, it must be upheld. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).

Wilson complains about the admission of State's Exhibits 5 through 10. State's Exhibit 5 demonstrates Rapoza as she was first seen by the fishermen. State's Exhibit 6 shows the heels of Rapoza's feet, revealing severe decomposition and maggot infestation. State's Exhibit 7 depicts one of Rapoza's hands in a decomposed state. State's Exhibit 8 shows Rapoza's abdomen area and a sanitary napkin. State's Exhibit 9 shows Rapoza's underwear. State's Exhibit 10 depicts the front side of Rapoza's partially nude body.

Here, all of the photographs were 5" X 7"; and the State concedes they were in color at trial although our record contains black-and-white versions. None of the photographs depicted a totally nude body, although State's Exhibit 10 shows Rapoza's partially decomposed breasts. But State's Exhibits 9 and 10 were relevant to corroborate Cerda's testimony that it was initially difficult to determine if the body was male or female. State's Exhibits 6, 7, and 8 all show varying degrees of decomposition and maggot infestation and also demonstrate what little identifying material was available to the police. This corroborated Ford's testimony that initial identification of the body was difficult.

These six photographs, which Ford testified accurately depicted the crime scene, were not exactly alike; were not unnecessarily duplicative; took almost

17

no time to introduce into evidence; and had very little, if any, potential to impress the jury in an irrational but indelible way. The photographs were relevant to show the circumstances of the killing and the crime scene at the time Rapoza's body was found. Although the photographs of Rapoza's body at the crime scene may be somewhat disturbing, their disturbing effect is due to the circumstances of the crime rather than any particular images depicted in the photographs. The trial court's ruling that the probative value of State's Exhibits 5 through 10 outweighed any prejudicial effect was certainly within the zone of reasonable disagreement. *See Winegarner,* 235 S.W.3d at 790. Therefore, the trial court did not abuse its discretion by overruling Wilson's objection and admitting these photographs into evidence. We overrule Wilson's third point.

## V. OBJECTED-TO TESTIMONY

In his fourth point, Wilson alleges that the trial court abused its discretion by admitting testimony about Rapoza's having worked for him as a prostitute over his relevance objections. The State responds that the testimony was relevant because it explained Rapoza and Wilson's relationship, demonstrated an escalating cycle of abuse by Wilson toward Rapoza, and helped explain to the jury that Wilson "loved to be in control of other people and that he became violent when he felt he was losing control over someone."

18

Questions of relevance are left largely to the trial court, relying on its own observations and experience, and the trial court will not be reversed absent an abuse of discretion. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App.), *cert. denied*, 510 U.S. 966 (1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. All relevant evidence is admissible except as otherwise provided by constitutions, statutes, or rules. Tex. R. Evid. 402.

We first note that Wilson does not now, nor did he at trial, voice a character evidence objection—his only objection is that Yeager's testimony that Rapoza worked for him as a prostitute and that Wilson became violent when she failed to earn sufficient amounts of money was irrelevant. *Compare* Tex. R. Evid. 404(a) *with* Tex. R. Evid. 401.

Yeager testified that Wilson initially recruited Rapoza to work for him as a prostitute. Yeager also testified that Wilson maintained control of any monies Rapoza earned. Yeager said that Wilson would become violent if Rapoza failed to earn enough money or did not feel like prostituting herself. She even testified that the cycle of violence evolved from "slapping" to the point of "pretty brutal beatings." This testimony tended to show that Wilson was violent toward Rapoza in the past and that his violence toward her was

19

escalating; therefore, the testimony was relevant to the charge of murder. *See* Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon 2005) ("In all prosecutions for murder, the state . . . shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased . . . to show the condition of the mind of the accused at the time of the offense."). Thus, the trial court did not abuse its discretion by admitting Yeager's testimony regarding Rapoza's having worked for Wilson as a prostitute. *See Reed v. State*, 59 S.W.3d 278, 280 (Tex. App.—Fort Worth 2001, pet. ref'd) ("We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard."). We overrule Wilson's fourth point.

## VI. CONCLUSION

Having overruled each of Wilson's four points, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL: LIVINGSTON, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 28, 2010